# Jacob H. Stewart

## *vs.*

# The Erie & Western Transportation Co., *et al*

A plaintiff's motion for judgment upon the pleadings admits whatever is well pleaded in the answer; and upon such motion the answer is not to be attacked for mere indefiniteness and uncertainty.

It is competent for a railroad company (if not restrained by its charter) to enter into contracts with connecting carriers, for the purpose of providing for through transportation over its road and the routes of such carriers, such contracts to be made with a *bona fide* purpose to regulate traffic in a reasonable and just manner; and it is the right and duty of every railroad company, so far as its authority permits, to increase its business by all usual and customary means, and to furnish the public with all needful facilities for safe, cheap and speedy transportation.

It is against the general policy of the law to destroy or interfere with free competition, or to permit such destruction or interference.

An unauthorized monopoly is, therefore, against public policy, as destroying and interfering with free competition. But if the right to exercise a monopoly be conferred by public authority, that fact is conclusive upon the question of public policy.

A corporation like the Lake Superior and Mississippi Railroad Company, though denominated a private corporation, is a *quasi* public corporation, from the nature of the purposes for which it is created, of the power with which it is endowed, and of the functions which it performs. It therefore owes the public the duty of exercising its powers with regard to the general and common interest. As a general rule, a traffic arrangement by which its benefits are restricted in whole or in part to one person or corporation, would, unless authorized by law, be against public policy and void.

The questions presented by this case relate to a contract (in regard to mutual transportation) entered into between the Lake Superior and Mississippi Rail-

road Company and the appellant. So much of such contract as is important in the consideration of this case, is set out at large in the opinion. Upon this appeal it is to be assumed from the pleadings that the contract complained of was made *bona fide*, and with the purpose of providing for through transportation over the connecting routes of the contracting parties. The objections made to the contract by the plaintiff, are : 1st, that it is *ultra vires* of the railroad company, and therefore illegal and void; and, 2d, that it creates and tends to create a monopoly, and is therefore illegal and void as being against public policy. The foregoing principles applied to the consideration of these objections to the contract, the court holding that the questions presented by such objections are not questions of law, and if not pure questions of fact, are at least compounded of law and fact, and therefore not to be determined as pure questions of law.

The plaintiff is a single stockholder in the railroad company, who sues for himself alone. The objection that there is a defect of parties because the plaintiff sues alone, instead of for himself and all other stockholders similarly interested, not having been taken by demurrer or answer, is waived under sections 73, 78, ch. 66, Gen. Stat.

If a corporation is employing its statutory powers, funds, &c., for purposes not within the scope of its institution, a court of equity will upon the application of a *dissentient* stockholder interfere by injunction. But if a stockholder assents to acts *ultra vires*, or although not originally assenting has for an unreasonable time acquiesced, and has permitted them to go unquestioned, so that other parties who have acted upon the faith of them (as, for instance, by making large expenditures of money) would suffer great injury from their repudiation, a court of equity would not be easily induced to grant relief at the instance of such stockholder. The same rules apply where the contract is complained of because it is against public policy as creating or providing for a monopoly.

Appellant's objection that the complaint in this case does not state a cause of action, because it does not allege that plaintiff will suffer any pecuniary damage in consequence of the contract complained of, held bad, because the complaint alleges that the contract if carried out will render plaintiff's stock worthless, and because if the contract is illegal it may lead to a forfeiture of the charter.

*Held* further, that if plaintiff is a *legal stockholder*, his right to protect his stock does not depend upon whether he became such upon a *bona fide* cash subscription to the stock of the company, or not.

As from the pleadings it is to be assumed upon this appeal that the railroad company in which plaintiff is a stockholder repudiates the contract and re-

fuses to be bound by it, or act upon it, and that it does not intend to and will not act upon the same. *Held,* that there is no occasion for the plaintiff as a stockholder to commence proceedings to prevent the contract from being carried into practical operation.

A court of equity does not interfere to prevent imagined wrongs which there is no ground for apprehending.

This action was brought in the district court for Ramsey county by a stockholder in the Lake Superior and Mississippi Railroad Co., in his own behalf, against said company, and the Erie & Western Transportation Co., for the purpose of enjoining said companies from doing business under a certain contract entered into between said companies, and to have said contract adjudged void.

The Erie & Western Transportation Co. alone answered.

Plaintiff made a motion for judgment upon the pleadings, which was granted, and judgment duly entered in favor of plaintiff.

The Erie & Western Transportation Co. appeals from such judgment to this court. The case is fully stated in the opinion.

BRISBIN & PALMER, for Appellant.

MASTERSON & SIMONS, for Respondent.

*By the Court.*—BERRY, J.—The Lake Superior and Mississippi Railroad Company is a corporation created under the laws of this state, and owning and operating a railway from St. Paul to Duluth. The appellant (The Erie and Western Transportation Company) is a corporation created by the laws of Pennsylvania, and engaged in the business of transporting by steamboats and other craft passengers and freight upon lakes Erie, Huron and Superior, and connecting waters,

and running boats to and from the harbor of Duluth.   The appellant entered into a contract with certain persons assuming to act for and on behalf of and in the name of The Lake Superior and Mississippi Railroad Company, by the terms of which an arrangement is made (to continue in force for the period of twenty years) in reference to through transportation of passengers and freight on the boats of the former, and the railway of the latter.   Respondent is a stockholder in the Lake Superior and Mississippi Railroad Company, and the object of this action by him brought is to have the contract mentioned adjudged void and cancelled, and to have the defendants (being both of said companies) perpetually enjoined from transacting any business under the same.   The appellant alone answered.   Respondent moved for judgment upon the pleadings; and from the order granting such motion the present appeal is taken.   The familiar rule, and one of much importance in this case, is that a motion of this character admits whatever is well pleaded in the answer.   The application of this rule will dispose of several objections which are made by respondent to the agencies by which, and the manner in which the contract was executed; for while the complaint alleges that such agencies were unauthorized, and such manner insufficient, the answer not only denies these allegations, and affirmatively avers that such agencies were authorized, and such manner sufficient, but it goes further, alleging in terms that the contract was lawfully made on behalf of said railroad company by its executive committee thereto lawfully authorized, and that the same long prior to the commencement of this action, with the knowledge and consent of all the officers and stockholders thereof, was fully and lawfully adopted, ratified and confirmed by said Lake Superior and Mississippi Railroad Company.   These allegations of the answer are certainly sufficiently comprehensive to meet the allegations of the

complaint; and if they are somewhat general and indefinite, that does not render them insufficient as against a motion for judgment on the pleadings, any more than it would against a demurrer. The statute provides another way in which a pleading is to be attacked for indefiniteness and uncertainty. Aside from these objections to the contract, (objections which were very little argued and do not appear to be strenuously insisted upon) the respondent contends that the contract was void; 1st, because it was *ultra vires* of the railroad company, and therefore illegal and void ; and, 2d, because it creates and tends to create a monopoly, and is therefore illegal and void as being against public policy.

The particular clauses of the contract to which exception is taken by the plaintiff form but a small portion of its entire text; but as the general scope of the contract appears to us to be involved in the present inquiry, we deem it desirable, if not indispensable, (notwithstanding the space required,) to quote from it at sufficient length to present all such portions as tend to show what its real character and purpose are. The contract, then, so far as we deem it material in this view, reads as follows:

"Memorandum of an agreement, made this twenty-fourth day of May, in the year of our Lord one thousand eight hundred and seventy, (1870,) by and between The Lake Superior and Mississippi Railroad Company, a corporation of the state of Minnesota, hereinafter designated as the party of the first part, and The Erie and Western Transportation Company, a corporation of the state of Pennsylvania, hereinafter designated as the party of the second part.

"Whereas, it is believed that the public convenience as well as the interests of the parties hereto, will be promoted by the establishment of an efficient line of steam vessels, to ply between the Lake Superior terminus, at Duluth, of the railroad

of the party of the first part, and Detroit and other Lake Erie ports, [Detroit being considered a Lake Erie port for all the purposes of the following agreement,] the parties hereto have, for the purpose of effecting that object, agreed as follows:

" *First.* That the party of the second part shall provide and have ready for use, whenever and as soon as the railroad of the said party of the first part is open for freight traffic between St. Paul and Duluth, in the state of Minnesota, at least six steam vessels, of an average capacity of not less than six hundred tons each, and shall thereafter, from time to time, provide such additional steam vessels as may be required for the transportation of freight and passengers between the railroad of the party of the first part and Detroit and the said other Lake Erie ports, and shall keep the said vessels, or so many of them as can be adequately supplied with either freight or passengers, or both, on either their eastward or westward trips, running regularly in connection with the railroad of the party of the first part between Duluth and Detroit and the other Lake Erie ports.

" *Second.* That the party of the first part shall furnish prompt and suitable transportation from or to Duluth, on the line of its railroad, for all passengers and freight destined for or delivered from the said steam line of the party of the second part, and shall guarantee to the party of the second part that sufficient docks, grain elevators and warehouses shall be provided and maintained at Duluth, to supply the requirements of the interchangeable business under this contract of the parties hereto; the said docks and elevators to be in water of sufficient depth to be accessible to vessels of the deepest draft which can pass between Lake Superior and Lake Erie.

" *Third.* That the party of the second part shall furnish prompt and suitable transportation to or from Duluth, by its

said steam line, for all passengers and freight destined for or delivered from the said railroad of the party of the first part.

" *Fourth.* That the sums received for transportation of freight and passengers, partly on the railroad of the party of the first part, and partly on the steam line of the party of the second part, shall be divided between the parties hereto, so that the party of the first part shall receive thirty per centum, and the party of the second part seventy per centum thereof, irrespective of the distance over which the said freight or passengers shall have been transported. IT BEING UNDERSTOOD AND AGREED, that the through rates on freight and passengers received by the party of the first part for transportation eastward, *via* the railroad of the party of the first part, and *via* the steam line of the party of the second part, shall be fixed by the party of the first part, and that the through rates on freight and passengers, received by the party of the second part for transportation westward, *via* the steam line of the party of the second part, and the railroad of the party of the first part, shall be fixed by the party of the second part, and that these through rates shall, so far as the competition of rival lines will permit, be made fairly remunerative to both parties. It being understood and agreed, however, that unless by mutual consent of the parties hereto, the rates on such westward bound freight and passengers shall be rates high enough to yield at least two dollars and twenty-five cents per ton of two thousand pounds to the party of the first part, and four dollars per passenger for full price first-class passengers, and two-thirds of four dollars per passenger for full price second-class passengers, and the rates of such eastward bound freight and passengers shall be rates high enough to yield at least five dollars and twenty-five cents per ton of two thousand pounds, and nine and one-third dollars per passenger for full price first-class passengers, and two-thirds of nine and one-third dollars per passenger for

full price second-class passengers to the party of the second part; and that in division as aforesaid between the parties hereto, the rates on eastward bound freight or passengers shall, for the purpose of ascertaining the share thereof to which the said party of the second part may be entitled, be assumed to be rates which will yield to the party of the second part at least five dollars and a quarter per ton of two thousand pounds, or nine and one-third dollars per passenger for full price first-class passengers, and two-thirds of nine and one-third dollars per passenger for full price second-class passengers, as aforesaid, and the rates on westward bound freight or passengers shall, for the purpose of ascertaining the share thereof to which the said party of the first part may be entitled, be assumed to be rates which will yield to the party of the first part at least two dollars and twenty-five cents per ton of two thousand pounds, or four dollars per passenger for full price first-class passengers, and two-thirds of four dollars per passenger for full price second-class passengers, as aforesaid, and the thirty per cent. of the party of the first part in the one case, and the seventy per cent. of the party of the second part in the other, shall be correspondingly reduced, if such reduction be necessary to secure to the other party the minimum rate per ton or per passenger, hereinbefore provided for; and if there should be any deficiency, the party fixing the through rate shall be responsible to the other for the same. It being expressly understood, however, that nothing hereinbefore contained shall be construed as authorizing either party to fix through rates, which will result in such deficiency.   And it is further understood and agreed, that in the division aforesaid between the parties hereto, the sums received above the fare for transportation, in payment of extra charges for meals, the use of sleeping berths, state-rooms, compartment cars or reclining seats, shall not be included; but if any such extra

charge shall be greater than is reasonable and customary, the excess over what is reasonable and customary shall be considered as having been received on account of fare for transportation, and shall be subject to division accordingly.

" *Fifth.* That the party of the second part shall guarantee to the party of the first part, that the party of the first part shall receive its thirty per cent. out of seven-twelfths of every sum received in payment of a through rate on freight and passengers transported on the railroad of the party of the first part, and the steam line of the party of the second part between New York and any point on the railroad of the party of the first part, *via* Erie, and that on freight or passengers transported as aforesaid, between New York, Philadelphia or Baltimore, and any point on the railroad of the party of the first part, the party of the first part shall receive in division between the parties hereto the same sum which the party of the first part would have received if the said freight or passengers had been transported, in manner aforesaid, between a point on the railroad of the party of the first part and New York, *via* Erie. It being clearly understood, that in thus guaranteeing to the party of the first part thirty per cent. of the above mentioned seven-twelfths, the party of the second part also guarantees to the party of the first part the minimum rate of two dollars and twenty-five cents per ton of two thousand pounds of freight, four dollars per passenger for full price first-class passengers, and two-thirds of four dollars per passenger for full price second-class passengers, out of through rates on westward bound freight or passengers, fixed by the party of the second part, as provided in the fourth section of this agreement.

" *Sixth.* That the party of the second part shall have the right to use all proper and lawful efforts to have freight and passengers destined to or from the railroad of the party of

the first part transported *via* Erie, and such railroad route southward or eastward of Erie, as the party of the second part shall prefer: *Provided, however,* that transportation by the route thus selected shall be as quick and as cheap as by any other route, and that the interests of the party of the first part shall not be prejudiced in any manner thereby.

"*Seventh.* That in consideration of the risks and responsibilities herein assumed by the parties hereto respectively, and to diminish, as much as possible, the chance of loss to either, in the experiment of establishing a new line of communication, each party hereto agrees with the other, that during the term of this contract it will, by all lawful means, endeavor to secure to the other the transportation of all the freight and passengers entrusted to it for transportation by water eastward, in the case of the party of the first part, and westward by rail in the case of the party of the second part, and the party of the first part agrees, that after its railroad shall have been opened through from St. Paul to Duluth, and the steam line of the party of the second part shall be prepared to transport freight and passengers between the lake terminus of the railroad of the party of the first part and the Lake Erie ports, it (the party of the first part,) shall and will pay to the party of the second part, on all freight and passengers which it (the party of the first part,) shall transport over its railroad, under through tickets or through bills of lading, for transportation over the railroad of the party of the first part, and any line of steam vessels other than that of the party of the first part, plying between Lake Erie ports and the lake terminus of the railroad of the party of the first part, the following sums, viz: One dollar and fifty cents ($1.50) for each first-class passenger transported a distance of seventy-five miles and upwards, over the railroad of the party of the first part; seventy-five cents (75-100 dollars) for each first-class passenger trans-

ported for a less distance than seventy-five miles over the said railroad, and two-thirds these sums for second-class, respectively: five cents (5-100 dollars) for each 100 pounds of freight, (other than coal or slate,) transported for a distance of seventy-five miles and upwards, over the said railroad; two and a half cents (2 1-2c) for each hundred pounds of freight (other than coal or slate,) transported for a distance of less than seventy-five miles over the said railroad. And the party of the second part agrees, that after the railroad of the party of the first part shall have been opened through from St. Paul to Duluth, and be prepared to transport freight and passengers between the lake terminus of the railroad of the party of the first part and the Lake Erie ports, it (the party of the second part) shall and will pay to the party of the first part, on all freight and passengers which it (the party of the second part) shall transport from Lake Erie ports by its steam line, under through tickets or through bills of lading, for transportation by the said steam line; and any railroad leading to, or forming part of, a route to St. Paul, other than the railroad of the party of the first part, the following sums, viz.: One dollar and fifty cents ($1.50) for each first-class passenger, and two-thirds of one dollar and fifty cents for each second-class; five cents (5-100 dollars) for each hundred pounds of freight. *And it is further* understood and agreed, that the obligation of either party to make the aforesaid payments to the other is to be conditional upon the party by whom the said payments may be claimed, having been prepared and willing to transport, promptly and efficiently, the freight or passengers for which the said payments may be claimed.

"*Eighth.* That neither party shall be responsible for injury to passengers, or for loss of or damage to freight transported under through tickets, or through bills of lading, partly on the railroad of the party of the first part, and partly on the steam

line of the party of the second part, occurring while such passengers or freight are in the custody of the other party; and that the party in whose custody such freight or passengers may be at the time of such injury, loss or damage, shall save harmless and indemnify the other party from and against all claims, suits, damages, costs and expenses resulting therefrom; but where a liability has accrued for such injury, loss or damage, and it cannot be ascertained which of the parties is responsible for the same, each shall contribute to the discharge of the said liability in proportion to its share of the sum payable for the transportation of the passenger injured, or the freight lost or damaged, as the case may be. And it is further understood and agreed, that all through tickets, or bills of lading, for transportation as aforesaid, to be issued by either party, shall provide that the responsibility of each party shall not extend beyond the limits of its own route.

\* \* \* \* \* \* \* \* \* \* \*

\* \* \* \* \* \* \* \* \* \* \*

"*Sixteenth.* That this contract shall take effect on the first day of June, eighteen hundred and seventy, and shall terminate on the first day of January, eighteen hundred and ninety, if either party shall have given one year's previous notice, in writing, to the other, that it shall then terminate; but if neither party shall have given the said notice, then the contract shall continue from year to year until the expiration of one year from the date of written notice that it shall terminate, given by either party to the other, when it shall terminate

"*It being understood,* however, that although the said contract shall have terminated as to future transactions, all past transactions shall be settled in accordance with its provisions.

"*In witness whereof,*" &c.

The counsel for plaintiff objects to the fourth article of the contract because it " provides a fixed rule for the division of the sums received for the transportation of freight and passengers, partly on the railroad and partly on the steam line of the transportation company, irrespective of distance."

His objection to the fifth and sixth articles is that they " are plainly designed to bind the parties mutually to give each other favors not extended to other parties; and to require an exercise of the corporative powers, with a partiality not authorized by their charters, and against law."

To the seventh article he objects that " after·requiring each party by all lawful means to endeavor to secure to the other a monopoly, it binds the railroad company to pay to the transportation company, certain sums of money on *all* freight and passengers which it, the railroad company, shall transport over its railroad under through tickets or through bills of lading, for transportation over its railroad, and *any line of steam vessels other than the Erie & Western Transportation Company.*"

He argues that " the simple effect and meaning of all this is that the railroad company shall, by use of its corporate powers and strength, secure to the transportation company a *monopoly* of the transportation upon the lakes, of *all* freight and passengers to and from this state, by that route, or pay the transportation company a *penalty* for not securing it to them."

As notorious and public facts outside of the contrace, constituting part of the public history of the state, and its legislative policy as he understands the same, the counsel says that " Such is the geographical position of the state of Minnesota, and such the character of her industries and products, that it is, and always has been, a leading object of her legislation to provide new and cheap routes and modes of transportation, and to invite and stimulate, and so far as is possible by legislation, produce rivalry and competition in the business of

transporting the products of the state to the eastern markets ; and in the importation of those things which the people need and cannot produce on their own soil. To this end the state gave a charter to the defendant, The Lake Superior & Mississippi Railroad Company ; and authorized it to take the private property of citizens without their consent, and granted it lands ; and the people voted it bonuses." *All* of which " were bestowed upon it for the well understood purpose of securing to the people of this state, by means of the construction of a railroad to Lake Superior, and its operation as a *public highway* by the company as a *common carrier*, all the advantages arising from the full and uncontrollable competition of the navigation and commerce of said lake and its connecting navigable waters" These statements of counsel, so far as they are matters of inference and opinion in regard to the purpose and object of the charter and endowments referred to, would, we think, require some qualification. For instance, the purpose of securing " free and uncontrollable competition " referred to, must be presumed to have been a *practical* purpose—a purpose to secure such competition so far as reasonably practicable— not absolutely, and in the abstract, and without regard to practicability. The *facts* stated may, however, on account of their public character, properly be taken notice of by this court, and they are entirely proper to be referred to in order that the contract to which this action relates may be looked at in view of the circumstances under which it was made, and its bearing upon the public interest. And it is equally proper, and for like reasons, to take account of considerations of a somewhat kindred nature presented by the counsel for appellant, as follows :

In the spring of 1870, (the contract purports to have been executed in May, 1870) the Lake Superior & Mississippi Railroad Company had completed its road to Hinckley, a point

about half way from St. Paul to Duluth, and the question as to what was to be done when the road should reach the lake naturally presented itself.   The company would then own a road one hundred and fifty-four miles in length, connecting the navigable waters of the Mississippi and the general railroad system of the state with the navigable waters of Lake Superior, and running through a region too sparsely settled to furnish much local business.

Without facilities for making proper connections at the lake it would be difficult, if not impossible, for the company to transact any considerable amount of through business, either in transporting passengers or freight.   It was therefore of great importance to the pecuniary interest of the company, as well as to the public interest, that in some way provision should be made for securing safe, speedy and regular transportation to and from the east in connection with the company's road, at reasonable prices and by responsible parties.   Without *such* transportation under *such* conditions, it is not and cannot be denied that the great object of chartering the railroad, and of endowing it with lands and money, would be frustrated.   For it may be added to what has been already said, that besides the purpose of securing a new outlet for exports, and a new inlet for imports, it was believed, and apparently upon good grounds, that the projected railroad of this company as part of a route would, in consequence of a short land carriage to lake navigation, be able to furnish through transportation to and from the east at lower rates than could be afforded elsewhere.   The appellant claims that it was for such reasons and purposes that the contract under examination was entered into.

It is not contended in this case that the railroad company does not possess authority to enter into arrangements and contracts with other connecting carriers by land or water for the

purpose of providing for through transportation over its road, and the routes of such connecting carriers. In view of the present modes of transacting business of this kind, this authority would seem to be an incident of railroad corporations, unless withheld by the terms of their charters. (*Perkins vs. P. S. & P. R. R. Co.*, 47 *Me.* 573; *Old Colony R. R. Co. vs. Evans*, 6 *Gray* 25;) and contracts of this kind when made with a *bona fide* purpose to regulate traffic in a reasonable and just manner are generally held good. 1 *Redfield on Railways* 612; *S. W. Railway vs. Redmond*, 100 *E. C. L.* 674. And in this instance we think authority to make such contracts is amply conferred by the first section of ch. 1, Sp. Laws 1861, by which it is provided that the Lake Superior and Mississippi Railroad Company "may have and exercise all powers, rights, privileges and immunities which are or may be necessary or convenient to carry into effect the purposes and objects of this act (the company's charter,) and of the said corporation," said purposes being in part defined in section 2 to be "*to use and operate*" a railroad, &c. And upon this point, subject to the qualification below mentioned, we agree, in the main, with appellant's counsel that "it is not only the right, it is the *duty* of every railroad company, to increase its business by all usual and customary means, and furnish its patron, the public, with all needful facilities for safe, cheap and speedy transportation. If, therefore, this railroad company had not attempted to provide any means of conveyance from and to its lake terminus at Duluth, it would have neglected the interests of its stockholders and been justly censurable as indifferent to the necessities of the case, the convenience of the general public and the pecuniary welfare of the citizens of Minnesota. It was its *duty* to secure the benefits of through business." These remarks are of course to be taken subject to the qualification that the company must possess requisite authority.

Before coming to the consideration of the particular objections made by plaintiff to the contract, it is to be observed that in examining the questions arising on this appeal we are confined to the contract itself, and to such facts, of the kind already mentioned, as may be properly noticed to enable us to place ourselves, as nearly as may be, in the situation of the parties to the contract at the time when the same was executed. This is the case, not only because the appellant's answer denies the important allegations of fact found in the complaint, except as to the corporate character of the defendants, the execution of the contract, and the fact that plaintiff is a stockholder, but because the answer alleges new matter of fact which upon the motion made in this case for judgment upon the pleadings is to be taken as true. The only portion of these denials and allegations of the answer to which we deem it necessary at this time to call attention is the following, viz.: "Defendant denies, that in fact or in law, said contract is a fraud upon the rights of said plaintiff, or upon all or any of the other stockholders of said railroad company, and denies that any officer, member or stockholder of said railroad company, is an officer, member or stockholder, or interested in the profits or business of this defendant, the said Erie and Western Transportation Company. Further answering, this defendant denies that said agreement is destructive of the business or interests of said railroad company, and denies that if the same is carried out by said parties thereto, and the business of said companies carried on thereunder, the said stock, interests, or property of said plaintiff in said railroad company, will be rendered wholly worthless, or injuriously affected to any extent whatever; on the contrary, this defendant alleges that said contract or agreement is just, fair, and equitable to the rights, property and interests of both said companies, and each and every officer, member, stockholder,

and creditor thereof, and will result, if faithfully adhered to and carried out according to its tenor and spirit, in a just and reasonable profit to said companies, without improper discrimination in favor of, or against either, and tend to enhance the value of said railroad, its property and franchises, and of each and every share of stock now in the hands of said plaintiff, * * ; defendant further denies that said agreement does give any undue or illegal preference to it, the said Erie and Western Transportation Company, or secure to it the advantages of a monopoly of the freightage or other business upon or over said railroad to the great detriment of the public, or to the great or special damage of said plaintiff, or to the special advantage of the stockholders and managers of the said transportation company, but alleges that the same is valid, just, and fair in all respects as stated aforesaid; and further, that * * * the location and length of said railroad, with reference to the extent of lake transportation, the distance and location of the great eastern markets, and the number of rival lines running south and east from St. Paul in constant and dangerous competition with said railroad for through freight and passengers, render such an agreement or arrangement with some responsible transporter from Duluth eastward, a matter of absolute necessity. That said Lake Superior and Mississippi Railroad Company now, and must for a long time to come, look for business at and west and south of St. Paul, which is seeking eastern markets, and for which, through rates and through bills of lading must be furnished; and that without such an agreement as was entered into with this defendant, whereby speedy and safe transportation, at well understood, reasonable rates, can be assured to consignors and shippers, most if not all of said business will be diverted from said railroad and pass over other lines where the requirements of speed, safety and economy, can be met and

supplied. And this defendant says: that its facilities and re-
sources for securing a due performance of its obligations
under said agreement, are ample and unequalled by those of
any other company engaged in similar transportation, and
that thereby it was enabled to and did, furnish considerations
to and enter into covenants with said railroad company, as
shown in said contract, of a valuable and important character,
as in and by said contract will fully and at large appear; by
means whereof said railroad company will be able to enter the
lists for said competing business, on equal, if not superior
terms, with all rivals, and thus secure its full share of busi-
ness." The answer further alleges in terms that the contract
was made by both parties "in good faith."

The denials contained in the foregoing extracts from the
answer, are denials of corresponding allegations of the com-
plaint, and it will be at once perceived that together with the
new matter set up they will present important questions of
fact to be investigated, perhaps, hereafter, but for the purposes
of the present appeal to be assumed to be answered in favor of
the defendant.

We are now prepared to take up the contract to which the
action relates, and to consider the general and special objec-
tions made to the same by the plaintiff.

His general objections to the contract are that it is *ultra
vires* of the railroad company, and against public policy. We
have already determined that it is competent for the railroad
company to enter into contracts with connecting carriers for
the purpose of providing for through transportation over its
road and the routes of such carriers, such contracts to be made
with a *bona fide* purpose to regulate traffic in a reasonable and
just manner; that it is not only the right, but the duty of every
railroad company, so far as its authority permits, to increase
its business by all usual and customary means, and to furnish

the public with all needful facilities for safe, cheap and speedy transportation.

In determining, then, upon the character of the contract in this instance, it is of the first importance to keep in mind that both upon the ground that neither fraud nor illegality are to be presumed, and upon the negative and affirmative allegations of the answer, the contract is to be assumed to have been made *bona fide*, with the purpose which appears on the face of it, and not colorably for any other. *G. N. Railway Co. vs. S. Y. Railway Co., 9 Exch.* 55; *Ib.* 641.

Bearing in mind, then, first, the competency of the railroad company to enter into an arrangement with the appellant as a connecting carrier, with a *bona fide* purpose to regulate traffic in a reasonable and just manner, and second, that it is to be assumed in this case that this contract was made *bona fide*, with the purpose appearing upon the face of it, and not colorably for any other, how can this court say that it is *ultra vires* of the railroad company? We are not now speaking of the question of monopoly or public policy, so far as that question is distinct from the question of *ultra vires.* How, in view of these principles, can this court say that the respondent is justified in objecting to the contract because it provides in its fourth article "for the division of the sums received for the transportation of freight and passengers, partly on the railroad and partly on the steam line of the transportation company, irrespective of distance?" The contract relates to through transportation exclusively. Looking at the contract itself, and, so far as we can notice them, at the circumstances under which it was made, upon what ground can this court say that this contract, presumed to have been made with a *bona fide* purpose to regulate traffic, was not made in a reasonable and just manner, and is not reasonably calculated to accomplish such purpose? The plaintiff contends that it is not, and the

defendant that it is. The issue thus raised between them is not an issue of law; it is not to be determined by judicial knowledge or judicial reasoning. The question presented, if not a pure question of fact, is at least compounded of law and fact, and for that reason not to be determined as a pure question of law. To reach its correct solution an investigation must be had as to the consequences and effect—the practical working—of the provisions of the fourth article complained of, and testimony must be submitted that the court may be put in possession of such information, such *facts*, as will enable it to decide whether this contract is or is not reasonably calculated to accomplish the purpose of a just and reasonable regulation of traffic. Certainly *we* cannot say that the provision objected to is not just or reasonable, nor that it, or something equivalent to it, is not practically *necessary* to a wise and fair arrangement between these companies—such an arrangement as will secure the best interests of both. So with regard to the other clauses of the contract specially objected to by the respondent, (the fifth, sixth and seventh,) how can this court, *upon the question of ultra vires* simply, determine as a matter of law that their provisions (which are also to be presumed to have been made with a *bona fide* purpose to regulate traffic, and not colorably for any other object,) are not made in a reasonable and just manner, and are not reasonably calculated to accomplish such purpose. So far as the question of *ultra vires* is concerned, plaintiff's special objections to the contract on account of the *partiality* provided for in the fifth, sixth and seventh articles of the same, are disposed of on similar grounds. This court cannot say as a matter of law, that the mutual aid therein provided for, and the mutual obligations thereby assumed, are unreasonable or unjust, in view of the competency and presumed *bona fide* purpose of the parties to regulate traffic, or that they are not reasonably calculated to effect such

purpose; and so far as the question of *ultra vires* is concerned, the same answer is to be made to the peculiar objection urged to the seventh article, viz.: that it "binds the railroad company to pay to the transportation company certain sums of money, on *all* freight and passengers which it, the railroad company, shall transport over its railroad under theough tickets or through bills of lading for transportation over its railroad, and any line of steam vessels other than the Erie and Western Transportation Company." This obligation is accompanied by a reciprocal obligation on the part of appellant, and having apparently the same object, and we cannot say as a matter of law, that the stipulations on both sides are not justifiable, and *intra vires* of the contracting parties, under the rule before enunciated. We repeat what we have said before, that it is of prime importance to keep in mind that this contract is upon this appeal to be assumed to have been made *bona fide*, and with the purpose which appears upon its face, and not colorably for any other, viz.: for the purpose of providing for through transportation over the connecting routes of the contracting parties. And the various stipulations of the contract so far as they are important to be considered here and now, are to be assumed to have been made *bona fide*, and as designed to accomplish the purpose spoken of. If the stipulations were to be considered independent of the *bona fides* of the contract, and independent of the purpose for which the contract was made, there might be some difficulty upon the very face of the contract in sustaining them. There would certainly be strong reason for contending that the railroad company had exceeded its powers; had undertaken to bind itself to do things which it had no authority to do, and had perhaps bound itself to divert its funds to unauthorized purposes, and as a result to deprive the plaintiff as one of its stockholders of the full dividends to which he is entitled, and which he would other-

wise have received. But the purpose of the contract being kept in mind, the portions of the contract objected to by plaintiff as *ultra vires*, cannot as a matter of law be said to be *ultra vires*. The result aimed at being a proper one, it may be arrived at and secured in different ways, and whether this is done in one way or another is immaterial, provided the means employed are a reasonable exercise of the powers conferred upon the railroad company either expressly or by implication. *G. N. Railway vs. S. Y. Railway Co., supra; S. W. Railway Co. vs. Redmond,* 103 *E. C. L.* 674

And this question of the appropriateness of the means to the end is then, as we have before remarked, not one of law, but of fact, or of mixed law and fact. We are not to be understood as holding that a railroad company is authorized to embark in business entirely foreign to the objects of its incorporation. What we have said is, of course, to be taken as said with reference to the questions presented in the case as to the validity of the traffic arrangement provided for by the contract under consideration. So much for the plaintiff's objections to the contract as being *ultra vires.*

We pass now to consider the plaintiff's objections to the contract on the ground that it is against public policy as creating and tending to create a monopoly. This objection of counsel is also based upon the fourth, fifth, sixth and seventh clauses of the contract "the simple effect and meaning" of which is, as the counsel argues, "that the railroad company shall, by use of its corporate powers and strength, secure to the transportation company a *monopoly* of the transportation upon the lakes, of *all* freight and passengers to and from this state, by that route, or pay the transportation company a *penalty* for not securing it to them." Much of what has been said upon the other branch of the case is applicable to this. It is of first importance here, as there, to bear

Stewart v. The Erie & Western Transportation Co. et al

in mind that this contract is upon this appeal to be assumed to have been made *bona fide*, and with the purpose which appears upon its face, and not colorably for any other, viz.: for the purpose of providing for through transportation over the connecting routes of the contracting parties. It is also to be remembered, as we have already determined, that it is competent for the railroad company to enter into contracts with connecting carriers for the purpose of providing for through transportation over its road and the routes of such carriers, such contracts being made with a *bona fide* purpose to regulate traffic in a reasonable and just manner. A monopoly is not necessarily unlawful, for it may be created, permitted, or tolerated by law. But we agree with the plaintiff's counsel, and with the cases by him cited, that it is against the general policy of the law to destroy or interfere with free competition, or to permit such destruction or interference. *Sanford vs. Railroad Company*, 24 *Penn. State* 378; *Hooker vs. Vandewater*, 4 *Denio* 353. An unauthorized monopoly is, therefore, against public policy as destroying and interfering with free competition. But if the right to exercise a monopoly be conferred by public authority, that fact is conclusive upon the question of public policy. *Vermont and Canada R. R. Co. vs. Vermont Central R. R. Co.*, 34 *Vt.* 49. A corporation like the Lake Superior and Mississippi Railroad Company, though denominated a private corporation, is a *quasi* public corporation, from the nature of the purposes for which it is created, of the powers with which it is endowed, and of the functions which it performs. It therefore owes the public the duty of exercising its powers with regard to the general and common interest. And as general propositions it is undoubtedly true, as said in Sanford vs. Railroad Company, 24 Penn. State 378, (a case cited by plaintiff) " that its benefits should be extended to all alike, and no special privileges should be

granted to one set of men or denied to others." As a general rule, then, a traffic arrangement by which its benefits are restricted in whole or in part to one person or corporation, as it would be an arrangement for a monopoly, would, unless authorized by law, be against public policy and void. Accurately speaking, however, the contract in this instance does not present a case of monopoly.

The contract in this case does not exclude other lines of boats than that of the appellant from a participation in the benefits of the railroad. The railroad company has not by this contract bound itself, or attempted to bind itself, not to suffer other lines of boats to run in connection with its road, or to receive passengers and freight from it, or bring them to it. Other lines of boats are at liberty to do these things at pleasure. But while it could hardly be claimed that any monopoly, in the sense of exclusive privilege of carrying to and from the railroad, is in terms provided for in this contract, the plaintiff contends that the practical effect of the contract is to confer such monopoly upon appellant. This objection brings up once more the propositions which we have so often reiterated as of paramount importance in this case, viz.: first, that it is competent for the railroad company to enter into contracts with connecting carriers for the purpose of providing for through transportation over its road and the routes of such carriers, such contracts being made with a *bona fide* purpose to regulate traffic in a reasonable and just manner ; and, second, that this contract is upon this appeal to be assumed to have been made *bona fide*, and with the purpose of providing for through transportation over the connecting routes of the contracting parties. Now admitting, as appears to be the fact, that the contract in this case, though not conferring upon the appellant a monopoly of running in connection with the railroad, does secure to and confer upon the appellant special

Stewart v. The Erie & Western Transportation Co. et al.

privileges, the practical result of conferring which *may* be to enable the appellant to monopolize the lake carriage connected with the railroad, it does not follow that the contract is therefore against public policy and void.   Still keeping in mind the two propositions so often repeated, the question. still recurs, can this court say as a matter of law, that this contract which is to be presumed to have been made with a *bona fide* purpose to regulate traffic, was not made in a reasonable and just manner, and is not reasonably calculated to accomplish such purpose ?   We think that this question must be answered in the negative, for the same reasons heretofore given in answering the same question upon the other branch of this case.   As there, so here, we think the question is not a question of law, but of fact, or of mixed law and fact.   If we are right, then the claim that the contract in its practical effect (though not in terms) confers upon appellant a monopoly, even if its truth be conceded, does not enable us to determine that the contract is void.   If the contract be such as the railroad company was authorized to make, upon the grounds before stated, then the fact that its execution results in the practical monopoly complained of is only the incident and consequence of the exercise of a lawful authority, and therefore not to be adjudged illegal or void as in contravention of public policy.

So far as these two branches of the case are concerned, our conclusion, then, is that upon this appeal the contract involved in this case cannot be held to be void, either as *ultra vires* of the Lake Superior and Mississippi Railroad Company, or as against public policy.

We have not deemed it necessary to consider particularly the provisions of the contract, fixing *minimum rates* of transportation, or that by which the contract is continued in force for twenty years.   We are unable to perceive why the objections to these are not disposed of by the general consider-

ations heretofore adduced, although as to the latter, it is possible that *at some future period* there might be reasons in *fact*, for objecting to it which do not now exist.

It remains to consider sundry objections urged to the competency of the plaintiff (who sues as a single stockholder in the Lake Superior and Mississippi Railroad Company, and for himself alone) to maintain this action. So far as these objections rest upon the ground of a *defect* of *parties* because the plaintiff sues alone, instead of suing also for all other stockholders similarly interested, they cannot be heard, since having been taken neither by demurrer nor answer they are waived. *Gen. Stat. ch.* 66 § § 73, 78.

If a corporation is employing its statutory powers, funds, &c. for purposes not within the scope of its institution, a court of equity will upon the application of a single dissentient stockholder interfere by injunction. *Dodge vs. Woolsey*, 18 *Howard* 331; *Addison on Contracts*, 6*th Eng. ed.* 703, *and citations; Gifford vs. N. J. R. R. Co.*, 2 *Stockton* 174; *Ward vs. Soc. Att'ys* 1 *Coll.* 379; *Kean vs. Johnson*, 1 *Stockton Ch.* 400; *Stevens vs. B. & R. R. R. Co.*, 29 *Vt.* 545; *Angell and Amos on Corp.* § 393. The right of the stockholder to this interference seems to be placed upon the ground, that from the fact that the corporation was created for *certain* purposes there is an implied contract that it shall not divert its powers or funds to *other* purposes, and that such diversion would be a species of breach of trust, [Stevens vs. B. & R. R. R. Co., *supra*] as well as a violation of law which might endanger the existence of its charter. *Manderson vs. Com. Bk. of Penn.* 28 *Pa. State* 379. But it is to a *dissentient* stockholder that the relief is granted, and to a stockholder who comes with *diligence* to assert his rights. If a stockholder assents to acts *ultra vires*, or although not originally or expressly assenting has for an unreasonable time acquiesced and has permitted them to go un-

Stewart v. The Erie & Western Transportation Co. et al.

questioned so that other parties who have acted upon the faith of them (as for instance by making large expenditures of money) would suffer great injury from their repudiation, a court of equity would not easily be induced to grant relief at the instance of such stockholder. *See authorities supra*; 2 *Redfield on Railways* § 220.

In this case it is alleged in the answer that the plaintiff assented to the contract which he seeks to have adjudged void and enjoined. Upon the motion made below, to which the present appeal relates, this allegation must be taken to be true; and if so, the plaintiff is not entitled to the relief which he seeks, so far as he rests his claim to it upon the ground that the contract is *ultra vires*. And acquiescence on plaintiff's part without original or express assent may have the same effect, though we discover no distinct allegation in the pleadings upon the point of such acquiescence in this case.

But in this case it is claimed that the contract sought to be adjudged void, and enjoined, is not only *ultra vires* of the railroad company, but that it is illegal and against public policy as providing for and creating a monopoly. And it is argued that under such a state of facts, the plaintiff, although *in delicto*, is not in the eye of equity *in pari delicto* with the defendant, the transportation company, even though the contract was consummated with his assent, since there is on the part of the court a necessity for supporting and vindicating the public interest. 1 *Story's Eq. Juris.* § 300 *et. seq.* But we think the weight of authority is in favor of the doctrine that acts *ultra vires* of a corporation are *illegal. Taylor vs. Chichester & Midhurst Railway Co., Law Reports* 2 *Ex.* 356; *Bissell vs. The M. S. & N. J. R. R. Co.,* 22 *N. Y.* 258, *Opinion Selden, J.* And such would clearly seem to be the law of this state under the provisions of sections 5 and 6, ch. 76 Gen. Stat. If this is so, there is no good reason, of which we can conceive, why the

plaintiff's right to maintain this action should stand upon any different footing because the contract provides for a monopoly, than because it is simply *ultra vires*. In either case the contract is *illegal*. In Bissell vs. M. S. & N. J. R. R. Co. *supra*, it is, as it seems to us, very justly remarked by Mr. Justice Selden, that contracts made by a corporation *ultra vires* are illegal, because it is in *contravention of public policy* for them to exercise powers which have never been granted to them. If this is so, then the necessity of supporting the public interest would seem to apply when a contract is simply *ultra vires*, as well as when it is also against public policy as providing for and creating a monopoly; and yet, as we have before endeavored to point out, it is not in every case of an act *ultra vires* that a court of equity will interfere upon the application of a stockholder. Without dwelling further upon this point, we are of opinion that the plaintiff's right to maintain this action upon the ground that the contract provides for a monopoly, is to be regulated by the same rules as if the contract were claimed to be simply *ultra vires*. So far as the public interest in such case is concerned, our statute (secs. 5 and 6, ch. 76 Gen. Stat.) would appear to provide an ample remedy by a proceeding instituted by the Attorney General, to whom, as the law officer of the state, it would seem that the duty of guarding the interest of the *public* is very properly committed.

Defendant's objection, that the complaint does not state a cause of action in plaintiff, because no facts are alleged going to show that he will suffer any pecuniary damage in consequence of the contract complained of, is not well taken, not only because the complaint alleges that the effect of the contract, if carried out will be to render plaintiff's stock worthless, but because if the contract is illegal as alleged it may lead to a total forfeiture of the charter of the company in which

plaintiff is a stockholder.    The other objection, that plaintiff is not entitled to the relief sought, *in equity*, because he is not a stockholder upon a *bona fide* cash subscription, is equally untenable.   If he is a *legal stockholder*, his right to protect his interest as such, cannot depend upon the manner in which he acquired it.

The further position that upon the pleadings it must be assumed that the railroad company repudiates the contract, refusing to be bound by it, or act upon it, and that it does not intend to and will not act upon the same, and that therefore there is no occasion for the plaintiff as a stockholder to commence proceedings to prevent the contract from being carried into practical operation, is, we think, well taken for obvious reasons.

A court of equity does not interfere to prevent imagined wrongs which there is no ground for apprehending.

These considerations dispose, we believe, of all the important questions in this case, and the result is that the judgment appealed from is reversed.