NEW ENGLAND EXPRESS COMPANY *vs.* MAINE CENTRAL RAIL-
ROAD COMPANY.

Where the Maine Central Railroad Company let to the Eastern Express Com-
pany, for four years, the exclusive use of a certain separate apartment in a
car attached to each of their passenger trains, for the purpose of transporting
the express company's messenger and merchandise, and agreed that they
would not, during the continuance of such contract, let any space in any car
on their passenger trains, to any other express [carrier; and the railroad com-
pany, before the expiration of such contract, but after reasonable notice to
them, refused to receive, upon any terms, from the New England Express
Company, when and where they received the Eastern Express Company's
freight, such packages as are usually carried by express companies, to be
transported by their passenger trains, *Held*, that the railroad company were
liable, under c. 193 of the Public Laws of 1868, to the New England Express
Company, in an action of damages.
It seems that an action at common law would lie against the railroad, under the
same circumstances.

ON FACTS AGREED.

CASE for refusing to carry the plaintiffs' express freight from
Bangor to Portland, on one of their passenger trains.

The writ is dated Sept. 5, 1868.

The case is sufficiently stated in the opinion.

*W. L. Putnam*, for the plaintiffs.

*Davis & Drummond*, for the defendants.

The defendant corporation have all the powers, &c., of the two
corporations of which it was composed. Laws of 1856, c. 651,
§ 4.

Those two charters are alike in respect to powers, &c., conferred,
and duties, &c., imposed. By § 6, " The transportation of persons
and property . . . and all other matters and things in relation to
said road shall be in conformity with such rules, regulations, and
provisions, as the directors shall, from time to time, prescribe and
direct."

The powers and duties being thus defined in the charter, if the

New England Express Company *v.* Maine Central Railroad Company.

contract with the Eastern Express Company was valid when made, it cannot be affected by the statute of 1868, enacted since it was made.

It has been already decided that these charters vest in the directors the power to prescribe the times and places at which the companies will receive persons and freight for transportation. *State* v. *Noyes*, 47 Maine, 189.

The charter requires the defendants to receive freight, &c., "at all proper times and places;" but in that case the court hold that these must be fixed by the directors; *a fortiori* under section six is the making of rules for the transportation vested in the directors.

Accordingly, the directors have prescribed as a rule that freight must be carried on merchandise trains; and this rule has been adhered to in all cases in which the defendants have undertaken to transport freight through their own agents.

No basis for the plaintiffs' claim can be found in the charter. We were not bound by that to carry the offered goods as requested. We had the right to say, we will carry them upon our merchandise trains.

The plaintiffs do not deny our right to make such rules; but claim that we became common carriers of express matter, by our voluntary acts, by carrying for the Eastern Express Company; and that we are therefore bound to carry parcels for everybody, upon the passenger trains, and in their writ allege that the defendants assumed to be and were common carriers of parcels upon their passenger trains. The case does not so find. The defendants do not receive, by any of their agents, any parcels for transportation. The express company are common carriers of parcels, and the defendants furnish transportation; they take no charge of the parcels, have no possession of them, but lease to the express company a part of a car, which they draw in their passenger train. The plaintiffs tendered to the defendants parcels to be carried by themselves, to be taken charge of by them; acts which they did not perform for the Eastern Express Company. The question narrows to this: Does a corporation, which contracts to do the trans-

portation for a common carrier, thereby become a common carrier itself?

Suppose A. becomes a common carrier of parcels in a vehicle between two places, and B. contracts to furnish the motive power, and draw the vehicle; does B. thereby render himself liable to furnish the motive power, and draw the vehicle of .every other party who desires to engage in the business between those places? Or render himself liable as a common carrier, to transport articles for all who apply? Or suppose a truckman contracts with a common carrier of parcels between two places, to furnish, for a round sum per year, horses and vehicles for such carrier's business; does he thereby make himself a common carrier, or become liable to furnish transportation for all other carriers between the same places? And does it make any difference if he pursues a legitimate business in traveling at the same time?

Yet this is what the plaintiffs claim. They do not claim that the defendants are bound by their charter to do what they require; they do not deny that our rules are reasonable; they lay out of account the fact that we are common carriers of merchandise on proper trains; but, finding us hauling cars about our legitimate business, and that we have contracted for the mere hauling of property for a common carrier, they claim that we thereby become common carriers of property ourselves. Suppose that we were not required to transport property at all, but only persons, and should contract with a common carrier of property, to draw the car containing his parcels, would that make us a common carrier?

What, then, is a common carrier? Or rather what and for whom is a common carrier bound to carry? He is bound according to his public profession. He may undertake to carry what he pleases. If he holds himself out as a common carrier of coal, no one will pretend he is thereby under any obligation to carry money. A person may become a carrier of money for banks only, and, if such is his profession, he cannot be compelled to carry anything else, or for anybody else. If he makes no professions otherwise than by his acts, he can be held to profess to do only what he actually does.

2 Redfield on Railways, § 165, 1. *The Citizens Bank* v. *Nantucket Steamboat Co.*, 2 Story, 16, 33.

" At common law, a carrier is not bound to carry for every person tendering goods of any description, but his obligation is to carry according to his public profession."

By Parke, B., in *Johnson* v. *Midland R. R. Co.*, 4 Exch. 367. The case finds that all we do or profess to do, is to draw such articles for the Eastern Express Company as they choose to put in that portion of the car of which they have sole control and possession; we receive no articles from any one to be forwarded; we take no risk as common carriers; we have no possession of any of the articles carried; the agents of that company do all the business of the carrying, except the mere hauling.

The Eastern Express Company is not our agent for any purpose; its agents are not our agents. In *The New Jersey Steam Nav. Co.* v. *The Merchants Bank*, 6 How. 344, it was held by all the judges that under a contract between an express company and the navigation company, somewhat similar to the one in this case, the latter are not liable as common carriers; though a majority of the judges held, that they were liable for gross negligence. They are agreed, that carrying under a contract for an express company, did not make the navigation company a common carrier.

If carrying as we do for the Eastern Express Company does not make us common carriers, the plaintiff's case fails, for such are the sole allegations in their writ; that it does not, the case last cited is conclusive.

If carrying for one, with a positive agreement not to carry for others, a refusal to carry for others, and carrying for that one as a private carrier, make us common carriers, it is difficult to perceive how any person or corporation can contract for transporting a single load without becoming a common carrier.

Suppose we should let a portion of a car under a similar contract for a man to assume the duties of an innkeeper therein, and he should proceed to do so, would that compel us to let a similar space to everybody who might wish to keep a hotel on our train? or

make us innkeepers ourselves ? Yet we are no more bound to carry freight on our passenger trains, unless we so choose, than we are to keep a hotel; and we may let a space in our cars for persons to do either without being ourselves either innkeepers or common carriers thereby.

Again; if we are common carriers by doing what we do, are we not so precisely in the manner alleged through the Eastern Express Company, and must not the articles to be carried be tendered to them or their agents? If we hold ourselves out as common carriers of express matter at all, it is only by and through that company. But the last thing the plaintiffs were to have their freight carried by that company.

But it is said by the plaintiff's counsel, that being a corporation allowed to take private property for a public use, we are bound to treat all alike. As to duties imposed by our charters, that is true, to a certain extent; but as to those voluntary matters which we assume for our own benefit or the public convenience, it is not true. As to those we stand precisely as a natural person. When we have fully complied with the provisions of our charter, and do all that is required by that, we have performed our full duty. Whatever we do in addition, we do voluntarily, and may do it in our own way, and no one has a right to complain. If we give the public reasonable accommodations at reasonable rates, there is no ground for complaint if, in particular cases, we go further.

Some English and Pennsylvania cases have been cited in support of the doctrine the plaintiffs maintain. But as said in *Fitchburg R. R. Co.* v. *Gage*, 12 Gray, 393, they "are chiefly commentaries upon the special legislation of parliament, regulating the transportation of freight on railroads constructed under the authority of the government there." They are, both in England and in this country, founded upon special statutes in every case. We had no statute of any degree of similarity till 1868, and if that changes our liabilities and duties, it is well settled that it is not binding upon us. *State* v. *Noyes*, 47 Maine, 189.

If this claim of the plaintiffs is valid, we could in no case make

special contracts for the transportation of freight. Accordingly, the right of such corporations to make such contracts has been tested, but was fully sustained. *Fitchburg R. R. Co.* v. *Gage,* 12 Gray, 393; *Same* v. *Tudor,* 12 Gray, 399 (note).

We maintain, and those decisions fully sustain us, that if we should advertise that in special cases and upon special contracts in every case, we would carry freight upon passenger trains, we should not be obliged to do it, except upon those very terms.

And in the case at bar, we do not carry freight ourselves at all, but transport goods in the possession and under the control of others, and so doing cannot make us common carriers any more than if the owners of the goods thus took charge of them, and we merely furnished the motive power.

If the act of 1868 is invoked, we say that if that imposes any new liabilities or obligations upon us, it is in violation of our chartered rights, and therefore, as to us, absolutely void.

APPLETON, C. J. On the first of January, 1865, the defendant corporation contracted with the Eastern Express Company to give them a certain specified space in the car attached to the passenger train, and " devoted to the carriage of the United States mail and the baggage of passengers transported upon said passenger trains," and to transport the agents and the property they may carry on certain conditions; especially agreeing that they would not " grant or let any similar space in any car or cars attached to the passenger trains, or run with them upon the defendant road, to any other persons as express carriers during the continuance of that contract," and until its termination, Dec. 31, 1869.

The plaintiffs, a corporation duly organized, and similar in its objects to the Eastern Express Company, made application to the defendants for privileges or rights similar to those granted said company, and on Aug. 27, 1865, " after seasonable notice of their intentions, offered at Bangor packages and other property such as is usually carried by express companies, to the proper persons in charge of the passenger trains upon the defendant road, and at the time

and place, when and where the Eastern Express Company load their freight, to be transported upon said road in their passenger train, and were ready to pay or secure the payment of a reasonable sum for such service, and to comply with all usual and reasonable terms applicable to the transportation of express matter, and the defendants refused to receive and transport said parcels, and property upon said passenger train," though they were transporting express matter for the Eastern Express Company, on their passenger train at that time.

It is admitted that the defendants are common carriers of passengers and merchandise. It is obvious that the contract with the Eastern Express Company is one conferring upon it a monopoly.

Common carriers are bound to carry indifferently, within the usual range of their business, for a reasonable compensation, all freight offered, and all passengers who may apply. For similar equal services, they are entitled to the same compensation. All applying have an equal right to be transported, or to have their freight transported, in the order of their application. They cannot legally give undue and unjust preferences, or make unequal and extravagant charges. Having the means of transportation, they are l able to an action, if they refuse to carry freight or passengers without just ground for such refusal.

The proprietors of a stage-coach, who hold themselves out as common carriers of passengers, are bound to receive all who require a passage, so long as they have room, and there is no legal excuse for a refusal. And it is not a lawful excuse, that they run their coach in connection with another coach which extends the line to a certain place, and have agreed with the proprietor of such other coach not to receive passengers who come from that place on certain days, unless they come in his coach. *Bennett* v. *Dutton*, 10 N. H. 481.

It is true, that by the rules and regulations adopted by the directors of the defendant corporation, passengers and their baggage only (except the United States mail) are to be transported in passenger trains, and merchandise is to be transported in merchandise trains.

No one can complain of these rules if adhered to. They are entirely unobjectionable. The complaint is of their continual violation, or rather of the interposition of a special and exceptional rule in the shape of a contract, by which they agree to carry the baggage of the Eastern Express Company, and contract not to take that of any other express company. If they can carry for one company and refuse to carry for another, they may equally and as well justify the carrying of A., and the refusal to carry B., both being unobjectionable as passengers, being ready to comply with all their requirements, and they having ample space for the accommodation of both.

The defendants cannot escape their common-law liabilities or avoid the performance of their duties to the public by fencing off a part of a car for the Eastern Express Company. They none the less carry the merchandise, though apart by itself. If this was for the purpose of mutual convenience, it would not increase nor diminish the duties or liabilities of a common carrier. If it was for the purpose of evasion, and to enable them thus evasively to give unjust preferences, the court will long hesitate before it will give effect to shifts and evasions for the sole purpose of eluding the law.

The charter of the Androscoggin and Kennebec Railroad Company was approved March 28, 1845; that of the Penobscot and Ken. R. R. Co., April 7, 1845. The act authorizing their consolidation was approved April 1, 1856, and the defendant corporation composed of the above railroad companies, was duly organized September 24, 1862. By the act of consolidation the new corporation is made subject to the liabilities, and is obliged to perform the duties of the two corporations of which it is the consolidation.

By § 6 of the charter of each of the original corporations, " A toll is hereby granted and established for the sole benefit of said corporation, upon all passengers and property of all descriptions, which may be conveyed or transported from time to time by the directors of said corporation. The transportation of persons and property . . . the weights of loads, and all other matters and things in relation to said roads, shall be in conformity with such rules,

regulations, and provisions as the directors shall from time to time prescribe and direct."

A toll is granted. But a toll implies uniformity of compensation for equality of service. It is for the sole benefit of the corporation and not to enable the corporation to give discriminating preferences. It is to be upon " all passengers and property of all descriptions," thus negativing the right to confer special favors on one or more, or to refuse to some what has been granted to others similarly situated. All passengers and property upon tendering the established toll have a right to the services for which it is the prescribed compensation. It is true, the directors may establish rules and regulations. But rules and regulations imply uniformity of action in relation to the subject-matter to which they apply, not the right to give exclusive and peculiar privileges to some, which are denied to others.

So by § 12 of the charter of the original corporations they each, " after they shall commence receiving tolls, shall be bound at all times to have said railroad in good repair, and a sufficient number of suitable engines, carriages, and vehicles for the transportation of persons and articles, and be obliged to receive at all proper times and places, and convey the same, when the appropriate tolls shall be paid and tendered." The language is most general. The right to prefer and discriminate, and by discrimination to benefit one and ruin another, is not given. When " the appropriate tolls are paid or tendered," the corporation is obliged to receive and convey, not whomsoever or whatsoever they may choose, but " persons and property " indifferently, coming within the prerequisite of the payment or tender of " appropriate tolls, and within just, impartial, and uniform rules, which alone the corporations were authorized to make.

The very definition of a common carrier excludes the idea of the right to grant monopolies or to give special and unequal preferences. It implies indifference as to whom they may serve, and an equal readiness to serve all who may apply, and in the order of their application. The defendants derive their chartered right from the State. They owe an equal duty to each citizen. They are allowed

to impose a toll, but it is not to be so imposed as specially to benefit one and injure another. They cannot, having the means of transporting all, select from those who may apply, some whom they will, and reject others whom they can, but will not carry. They cannot rightfully confer a monopoly upon individuals or corporations. They were created for no such purpose. They may regulate transportation, but the right to regulate gives no authority to refuse, without cause, to transport certain individuals and their baggage or goods, and to grant exclusive privileges of transportation to others. The State gave them a charter for no such purpose.

Such is the common law on the subject. The legislation of the State has been in accordance with and in confirmation of these views.

By c. 193, § 1, approved Feb. 29, 1868, " all express-men and all persons engaged in express business shall have reasonable and equal terms, facilities, and accommodations, for the transportation of themselves, their agents and servants, and of any merchandise and other property, upon any railroad owned and operated within the State, and for the use of the depot and other buildings and grounds of such corporation, and at any point of intersection of two railroads, reasonable and equal terms and facilities of interchange."

The defendants cannot object to this statute, unless they had, before its passage, an unlimited right to impose unreasonable and unequal terms, to give special privileges, to confer monopolies, selecting from the great public, from whom they acquired their powers and franchise, who shall be the special and selected objects of their bounty, and who shall not. The wildest and most extravagant supporter of vested rights will hardly claim this. It would imply madness or crime on the part of a legislature granting such rights. If, then, the defendants have no such right, the grant of a monopoly to one corporation at the expense of the general public is alike a violation of the common as of the statute law, and cannot be upheld.

The plaintiffs were willing and offered to pay reasonable freight for the services demanded, and to comply with all just and reason-

able rules and regulations the defendants had or might establish; but the defendants refused to receive and transport the freight offered, in accordance with the plaintiffs' request.

The defense is not that there was want of room or inability to transport the plaintiffs' freight as desired; or that the accommodation granted the Eastern Express Company was exceptional, granted only on a special occasion, or urgent necessity, and afforded only to meet such accident or to supply such necessity; but it is that they may lawfully select one individual or corporation upon whom they may confer exclusive and valuable privileges to the exclusion and injury of the rest of the community.

. It is argued that the contract between the defendant corporation and the Eastern Express Company, it being made before the passage of the act of 1868, is a bar to the plaintiffs' right to recover. But such cannot be the case, unless the defendants had the right to grant " terms, facilities, and accommodations " unreasonable and unequal as between the different express companies desiring the transportation of their goods, merchandise, &c., over their railroad. But this cannot be claimed. Further, if such a contract were to be held an answer to the plaintiffs' claim, on the ground that the legislature had no right to impair its validity, then it would follow, that they might be ousted of their control and jurisdiction during the whole existence of the defendant corporation; for the defendants might have made their contract coextensive in time with their corporate existence.

Provisions similar to those of 1868 exist in England, and the courts have ever held all acts of undue preference void, while they have sustained the railroad corporations, when they have only the interests of the proprietors and the legitimate increase of the profits of the railway in view. It is not a legitimate ground for giving preference to one of the customers of a railway company, that he engages to employ other lines of the company for the carriage of traffic distant from, and unconnected with the goods in question; and it is undue and unreasonable to charge more or less for the same service, according as the customer of a railway thinks proper

or not to bind himself to employ the company on other and totally distinct business. *In re Baxendale* v. *The G. W. R. R. Co.* 94, E. C. L. 308. But in that case a difference of charge was sustained upon goods from and to the same places, between persons who sent large quantities at a time, and stipulated to send given large quantities every year, and others who declined to do so. " The advantages there stipulated for and by the company," observes Willes, J., " related to the carriage of the goods upon the same line, and directly affected the rate at which they could be probably carried. In fact those advantages made a difference similar to that between the selling of goods wholesale and retail, the profit of carrying goods in large quantities and at the less rate at which they were carried, equalling or exceeding the profit upon the goods sent in smaller quantities at the greater rate at which they were carried." *In re Garton* v. *Bristol & Exeter R. R. Co.* 95, E. C. L. 655, Willes, J., says, " As to the third branch of the case, viz., that a lower charge is made by the company to persons residing at Bridgewater for the carriage of goods, than is made to the complainants, no satisfactory reason seems to me to have been given for that reduction. It is not shown that it is rendered necessary for the purpose of meeting and overcoming competition. . . . The inequality of charge cannot be without a reason ; and I am at a loss to see any other possible reason than a desire on the part of the defendants to displace the complainants as carriers, so that they themselves may become the sole carriers on their line of railway." Where a statute requires a railway company to carry for all who may apply and upon equal terms, they have no right to impose increased prices upon express carriers who send freight by the company's trains, in aggregate quantities made up of small parcels directed to different individuals. *Pickford* v. *Grand Junction Railway*, 10 M. & W. 399. Much less have they a right to carry for one express company and refuse to carry for another, when they have the ability to carry for both.

*In re Mariott* v. *The London & South-western Railway Co.*, 87 E. C. L. 498. The defendant railway company made arrangements

at one of their stations with A., the proprietor of an omnibus running between the station and K., to provide omnibus accommodations for all passengers by their trains to and from K., and allowed A. the exclusive privilege of driving his vehicle into the station-yard for the purpose of taking up and setting down passengers at the door of the booking-office. " I am of opinion," observes Cockburn, C. J., "that in giving an undue and unreasonable preference to and in favor of Williams, brings the company within the provisions of the statute in question. (18 Vict. c. 31, § 2.) I see no reason why this preference should be given to one omnibus and to the exclusion of another. . . . I therefore think the rule should be made absolute, to the extent of enjoining the company to admit the complainant's omnibus into the station of this railway at all reasonble times, for the purpose of receiving and setting down passengers and goods, in the same manner, and to the same extent as other public vehicles of a similar description are admitted into the yard for that purpose." In *Piddington* v. *S. E. Railway Co.*, 94 E. C. L. 109. The defendants made an increased charge upon "packed parcels." The jury negatived that they incurred an additional risk or expense on the carriage thereof. " Here," remarks Byles, J., " the defendants charge double for certain packages, though the goods are of a like description, and the jury have found there is no increased risk or expense incurred by them in the carriage of them. That seems to me to be an express violation of the 17th section." In *Sandford* v. *Railway Co.*, 24 Penn. 378, it was held that express companies had as good a right to the benefits of a railroad as the owners of the packages which they carried personally had, and that a contract giving to an express company an exclusive right of transportation on the passenger trains was illegal and void, both at common law and by the statutes of the State. " Whenever," observes Lewis, C. J., " a charter is granted for the purpose of constructing a railroad, the corporation is clothed with the power to take private property, in order to carry out the object, it is an inference of law from the extent of the power conferred, and the subject-matter of the grant, that the road is for the public accommodation. The

New England Express Company *v.* Maine Central Railroad Company.

right to take tolls is the compensation to be received for the benefits conferred. If the public are entitled to these advantages, it results from the nature of the right that the benefits should be extended to all alike, and that no special privileges should be granted to one man or set of men, and denied to others. The special stipulations inserted in charters, for the purpose of securing these rights, are placed there in abundance of caution, and affirm nothing more than the common right to equal justice, which exists independent of such provisions. . . . The supposed necessity for such provisions, in charters granted in this country and in England, proves nothing more than that the law-makers in both countries were aware of the difficulty in holding large corporations to those common obligations of justice which individuals feel bound to acknowledge without legislative enactment."

The plaintiff is entitled to maintain his action.

*Defendant defaulted.*

*Damages to be assessed by the judge at nisi prius.*

KENT, BARROWS, DANFORTH, and TAPLEY, JJ., concurred.

CUTTING and WALTON, JJ., did not concur.