BRYANT and another *v.* WESTERN UNION TEL. Co.

*(Circuit Court, D. Kentucky.* May 2, 1883.)

GRAIN GAMBLING—COMMISSION—RIGHT OF TELEGRAPH COMPANY TO REMOVE "TICKER" FROM A "BUCKET-SHOP."

The complainants were dealers in grain and produce. They never bought or sold for present delivery, but always dealt in futures and upon margins. Whenever the required margin was placed in their hands, they would buy or sell, for customers desiring them so to do, grain and produce at the last quotation of the Chicago Board of Trade. Such purchases or sales were always for the next or succeeding month's delivery, and the deal was taken by the complainants themselves. The customer was always required to keep his margin good, and that without notice; and if, at any time before the date fixed for delivery, the market in Chicago went against the customer to the extent of his margin, the trade was closed, the complainants taking the margin and the customer not being held personally liable, the extent of his loss being his margin. If, however, the market went in favor of the customer, he could call for a settlement any time and without regard to the maturity of his contract, and he was then paid the difference between the then market price and the price at which he bought or sold, less a sum which was called by the complainants "commission," which sum was one-fourth cent per bushel of grain alleged to be bought or sold. *Held—*

(1) That this was gambling of a most pernicious and demoralizing species, which a court of equity would not protect by enforcing contracts or otherwise.

(2) That the alleged commission was not commission at all, but was really the odds which the customer gave the complainants in the wager on the future of the market; because the complainants always took the deal themselves, and did not pretend to buy or sell to others for the account of the customer.

(3) Complainants being in the business of gambling, equity will not compel a telegraph company to furnish to them, by means of a telegraph machine known as a "ticker," quotations of prices ruling upon the Chicago Board of Trade, and this even though complainants were members of that board.

In Equity.

*Arthur Carey* and *A. P. Humphrey*, for complainants.

*Rozel Wissenger*, for defendant.

BARR, J. This cause is here by removal from the Louisville chancery court, and is now submitted on the motion of the defendant to dissolve the injunction granted by the chancellor. This injunction was granted upon the *ex parte* motion of complainants, and cannot have the same weight with me as if granted upon notice and a hearing. The state practice seems to be to grant injunctions without notice, and almost as a matter of course, if the petition sets out sufficient *prima facie* grounds. The particular thing complained of by complainants is the removal of a "ticker" in their office, and a consequent withdrawal of the reports of the daily transactions which take place on the Chicago Board of Trade. The Chicago Board of Trade is a private corporation, and can give or withhold from the public its transactions. It may give these transactions to the public through such agents or upon such conditions as the board may deem advisable. The defendants, through their agents, were and are reporting the daily markets upon this board. This is done by the permission of the board, and not as a right which it has without such permission. The defendants, therefore, in regard to these reports of the daily prices on the board, obey the properly expressed will of the board of trade. The duty of a telegraph company to the public in its business of telegraphing is not in this case. Neither is the question of whether or not a telegraph company can go into the business of news-gathering, and, having gathered news, which is common to the public, in the sense that all have a right to gather it, and then transmit it by means of its telegraph lines to some, and refuse it to others who are willing to pay the same rate and be governed by the same regulations as those who receive the news, before me for consideration.

The relations which telegraph companies bear towards the public may be such as to prevent any discrimination in the distribution of such news. Upon this subject I express no opinion, but it seems to be quite clear that a merchant, or a number of merchants and dealers organized into a corporation, can give to a reporter the terms of their private transactions, to be transmitted to others, upon any conditions they may choose to impose, even to the extent that these transactions shall not be transmitted to others dealing in the same goods or commodities. These transactions on the board of trade are private transactions, in the sense that the general public are not entitled to them, except by the permission of the board. The directors of the board of trade, in November, 1882, made the permission to defendant to be on

the floor of the board, and to report the current transactions of the board, conditional. This condition was that these current reports would not be published to or for the use of any person or organization in the city of Chicago, or elsewhere, that would publicly post the said quotations with a view of making transactions with other persons, based upon such quotations. The notice given defendant by Mr. Randolph was not in the language just quoted, but prohibited the defendant furnishing, after the first of January, 1883, the current quotations of the board to those who carried on the trade or business known as "bucket-shops." If the statement of Mr. Randolph gives truly the action of the board of trade, the complainants are of the prohibited class, as the affidavits of both sides concur in stating that they "publicly post their quotations with a view of making transactions with other persons, based upon such quotations." The notice, however, names those who carry on "bucket-shops" as the persons who are not to be furnished with these market quotations; hence it is material to inquire whether complainants carry on such a business. The complainants exhibit a form of contract which they use in these trades, and insist that it is legal, and that they do a legitimate business and do not carry on a "bucket-shop." The defendant, however, insists that the form of the contract exhibited, if legal, is a cover; and complainants' business is really that of betting and taking bets upon the fluctuations of the market prices of grain, produce, etc., and that they do carry on what is commonly known as a "bucket-shop."

There is filed with one of the affidavits a pamphlet issued by complainants, explaining their business and urging the public to deal with them. From this pamphlet and the affidavits filed by the parties I find that complainants' course of dealing is about this:

The complainants never buy or sell for present delivery, but always deal in futures and upon margins. Whenever the required margin is placed in the hands of complainants, they will buy or sell, as customers desire, grain, etc., at the last quotation of the Chicago Board of Trade. This is always for the next or succeeding month's delivery, and the deal is taken by the complainants themselves. The customer must always keep his margin good, and that without notice, and if any time before the time fixed for the delivery the market in Chicago goes against the customer to the extent of his margin, the trade is closed and the complainants take the margin and the customer is not personally liable, the extent of his loss being his margin. If, however, the market should go in favor of the customer, he may call for a settlement at any time and without regard to the maturity of his contract, and he is then paid the difference between the then market price and the price at which he bought or sold, less a sum which is called by complainants "a commission." This sum, which is one-fourth of a cent on each bushel of grain which is alleged to be bought or sold, is not a commission, as the complainants always take the deal themselves, and do not pretend to buy or

sell to others for the account of the customer, but is really the odds which the customer gives them in the wager on the future of the market.

It is perhaps true that if the customer keeps his margin good, so that he cannot be closed out, and does not exercise his right to settle upon the basis of the difference in the prices of the grain, etc., he can demand a compliance with the contract and a delivery, but if the course of business between the complainant and their customers is to settle their alleged contract by a payment of the differences in the market rates, the fact that a customer may, under certain circumstances, require an actual delivery, does not relieve the complainants from the charge of carrying on a "bucket-shop." It is the general course of a man's business which defines and classifies it. If "bucket-shop" means a place where wagers are made upon the fluctuations of the market prices of grain and other commodities, then I think the evidence shows the complainants keep such a "shop," and are of the class which defendants are prohibited from furnishing the market quotations of the Chicago Board of Trade. This is gambling, and a very pernicious and demoralizing species of gambling, which a court of equity should not protect even if the board of trade had not taken the action it has. It is true that this kind of gambling has not yet been made criminal by the statute law of the state, still if a case of wager is made out none of the state courts will enforce such contracts. *Sawyer* v. *Tagart, etc.*, 14 Bush, 727. Gambling on the fluctuation in the market prices of stocks, grains, etc., is against the public policy of the state, though it may not be a crime punishable by fine or imprisonment.

The complainants, in the bill which they have tendered, allege another ground for this injunction, and that is their membership of the Board of Trade of Chicago. I am inclined to the opinion that if the complainants' rights as members of the board have been violated, they must seek a remedy against that corporation, and have none against the defendant. But, if wrong in this, I do not think this ground will avail, because this record does not show that their rights as members of that board have been infringed or violated. The complainants were furnished the reports of this board by means of a "ticker" at their place of business in this city, not as members of the board of trade, but as any other person would be furnished them. The board of trade do not furnish or cause to be furnished these reports to its members, and the right to them does not in any way pertain to the membership of the board, and is entirely distinct from it.

The injunction should be dissolved; and it is so ordered.

---

May a board of trade, or other similar association, lawfully discriminate in furnishing quotations of its ruling prices? Judge BARR, in deciding the principal case, seems to imply that it may so discriminate. " The Chicago Board of Trade," says he, " is a private corporation, and can give or withhold

from the public its transactions. It may give these transactions to the public through such agents or upon such conditions as the board may deem advisable."

It may be true that that board "can give or withhold from the public its transactions," or that "it may give these transactions to the public through such agents or upon such conditions as the board may deem advisable;" but it is doubtful whether its right so to do results from its *status* as a private corporation. Private corporations are not, simply because they are private corporations, exempt from performing their duties to the public in a lawful and proper mode, any more than private individuals are. For example, the law prohibits one who carries for the public from discriminating unjustly as to whom he will carry, or as to the prices he will charge for the service. This rule of law is as compulsory upon private corporations—for example, railway companies, who are common carriers—as it is upon private individuals. All are equally within its meaning. It is obvious, therefore, that the duty of the Board of Trade of Chicago, or of any similar institution, as to disseminating its quotations of prices, cannot be determined by reference merely to its *status* as a private corporation.

Perhaps it will aid somewhat in determining the rule of law governing the board of trade in distributing its quotations of prices to examine the nature of the service it performs, and to settle definitely, if possible, for whom that service is rendered.

The service consists in placing within reach of almost every one in the business world the quotations of prices that rule upon the markets of the board. By telegraphing these quotations far and wide, the board informs farmers what prices they may get for their wheat, corn, and grain, where such prices will be paid, and by whom. By the same means the board informs consumers where they may buy wheat, corn, flour, and grain; what the supply on hand is; how much must be paid for a given quantity; and who has it to sell. The board stands as a middle-man between the producing and the consuming public. It serves both classes of the public by furnishing each with the information it desires. Nor is this service gratuitous. The board is paid for it in the profits which accrue to its members from their purchases from producers and their sales to consumers. A moment's reflection makes clear that a service is rendered, viz., the furnishing of information, and that it is rendered for somebody, viz., for the public.

There being a service performed for the public, the next question is, what rule of law governs the performance of that service? Unquestionably there must be some rule, else the conduct of the board in performing the service may be purely arbitrary, and subject only to regulation by its own caprice or will, with or without regard to right or wrong—a condition of things hardly to be credited. There is undoubtedly a rule. It is the same rule that governs every service performed for the public, namely: All services which any person, natural or artificial, undertakes to render the public must be performed impartially for all, and without undue preference or unjust prejudice towards any. In support of this rule see the American cases in note.[1] The principal English cases are also in the note.[2] In England and in many of the

[1] McDuffee v. Railroad, 52 N. H 448; N. E. Ex. Co. v. M. C. R. Co. 57 Me. 188; Bennett v. Dutton, 10 N. H. 481; Sanford v. Railroad Co 24 Pa. St. 378; C., B. & Q. R. Co. v. Parks, 18 Ill. 460; Audenried v. P. & R. Co. 68 Pa. St. 370; C. & N. W. R. Co. v. People, 56 Ill. 365; Messenger v. Penn. R. Co. 7 Vroom, 407; Cumberland Valley Co's Appeal, 62 Pa. St. 218; Camblos v. P & R. R. Co. 4 Brewst. 563, 622; Vincent v. C. & A. R. Co. 49 Ill. 33; Shipper v. Penn. R. Co. 47 Pa. St. 338; Stewart v. Erie & W. T. Co. 17 Minn. 372; McCoy v. C., I., St. L. & C. R. Co. 13 Fed. Rep 7; Hays v. Penn. Co. 12 Fed. Rep. 309; Express Co. Cases, 10 Fed. Rep. 210, 869.

[2] Pickford v. G. J. R. Co. 10 Mees. & W. 399; S. C. in Equity, 3 Eng. R. & C. Cas. 534; Baxendale v. G. W. R. Co. 14 C. B. (N. S.) 1; Baxendale v. G. W. R. Co. 16 C. B. (N. S.) 137; Sutton v. G. W. R. Co. 3 H. & C. 800; Baxendale v. L. & S. W. R. Co. L. R. 1 Exch. 137; S. C. 4 H. & C. 130; Palmer

states this rule has been enacted in the form of statutes regulative of railways, but such statutes are declaratory merely of the common law.

There must be, in performing public services, no unjust, unreasonable discrimination between persons. This is the rule governing all who serve the public, no matter what may be the nature of the service they render, nor what may be the political or legal *status* of the servant. He may be a private person or a public person, a natural person or a corporation. The question to be answered is: Is the service rendered for the public? If it is, it must be performed alike for all who are similarly situated. Governments themselves in the United States cannot discriminate unequally and unreasonably among their citizens. Still less may corporations, which are but the creatures of government, so discriminate.

It results from these principles that the Chicago Board of Trade, or any other similar association undertaking to serve the public with information, cannot lawfully single out one person or firm and unreasonably deny to them the information which it holds itself ready to furnish to all the rest of the business world.

These views derive some support from a decision by Chancellor TULEY, of Chicago,[1] who said:

"The board of trade does not profess to be engaged in a moral reform movement, nor is its action aimed solely at the 'bucket-shops,' as the preamble to this resolution passed by its managers shows its grievance to be that 'market quotations, to the injury of our members, are furnished parties no way contributing to the support of the board.' It is competition, not immorality, which the board of trade is seeking to put down.

"It is evident that if the managers can dictate that the quotations shall not be furnished this complainant, they may cut off from receiving the same every merchant, commission house, broker, banker, or other persons outside the board, and might, if they thought proper, dictate that only one man in New York city—Jay Gould or Keene—should be permitted to receive them by telegraph. In such case there would be but little difficulty in obtaining a monopoly in the dealing in and brokerage of grain and other commodities.

"What forestalling of the market might take place, and what gigantic monopolies might be built up in commercial centers, where values are determined by the ruling prices on the Chicago Board of Trade. Neither the establishing of monopolies nor the destroying of competition is looked upon with favor by the courts.

"The corporation known as the Chicago Board of Trade was organized more than a quarter of a century ago, by a few merchants of this city, for their own convenience in the transaction of their business. By reason of the wonderful development of the country tributary to Chicago as a commercial center,

---

v. L & S. W. R. Co. L. R. 1 C. P. 588; West v. L. & N. W. R. Co. L. R. 5 C. P. 622; Palmer v. L. B. & S. C. R. Co. L. R. 6 C. P. 194; Parkinson v. G. W. R. Co. L. R. 6 C. P. 554; Baxendale v. G. W. R. Co. 5 C. B. (N. S.) 309; Id. 33i; Nicholson v. G. W. R. Co 5 C. B. (N. S.) 366; Garten v. G. W. R. Co. Id. 669; Garten v. B. & E. R. Co. 4 H. & N. 33; 6 C. B. (N. S.) 639; Bennett v. M. S. & L. R. Co. Id. 707; Nicholson v. G. W. R. Co. 7 C. B. (N. S.) 755; Ransome v. E. C. R. Co. 8 C. B. (N. S.) 709; Garten v. B. & E. R. Co 1 B. & S. 112; Baxendale v. B. & E. R. Co. 11 C. B. (N. S.) 787; Branley v. S. E. R. Co. 12 C. B. (N. S.) 63; Baxendale v. L. & S. W. R. Co. Id. 758; Parker v. G. W. R. Co. 7 M. & G. 253; Crouch v. L. & N. W. R. Co. 14 C. B. 55; Crouch v. G. N. R. Co. 9 W. H. & G. 556; Finnie v. G. & S. W. R. R. 2 Macqueen,

H. L. Cas. 177; S. C. 34 Eng. L. & E. 11; Crouch v. G. N. R. Co. 11 H. & G. 742; Barker v. M. R. Co. 18 C. B. 46; Parker v. G. W. R. Co. 6 E. & B. 77; Caterham R. Co. v. L. B. & S. C. R Co. 1 C. B. (N. S.) 410; Barrett v. G. N. R. Co. 1 C. B. (N. S.) 423; Ransome v. E. C. R. Co. Id. 437; Oxlade v. N. E. R. Co. Id. 454; Marriott v. L. & S. W. R. Co. Id. 499; Beadell v. E. C. R. Co. 2 C. B. (N. S.) 509; Painter v. L., B. & S. C. R. Co. Id. 702; Baxendale v. U. D. R. Co. 3 C. B. (N. S.) 324; Harris v. C. & W. R. Co. Id. 693; Jones v. E. C. R. Co. Id. 718; Baxendale v. E. C. R. Co. 4 C. B. (N. S.) 63; Ransome v. E. C. R. Co. Id. 135; Cooper v. L. & S. W. R. Co. Id. 738; Piddington v. S. E. R. Co. 5 C. B. (N. S.) 111.

[1] Public Grain and Stock Exchange v. W. U. T. Co., Circuit Court of Cook county, May, 1883.

the business done upon the floor of this board of trade has become a great and controlling factor in fixing the prices or value of grain, meats, and other commodities, not only throughout the United States, but to some extent in Europe. Millions upon millions of property, consisting principally of wheat, corn, and meats, the common necessaries of life, are affected in value daily and hourly by the transactions had upon the floor of this board of trade. So widely extended and important has the influence of the business there transacted been upon the price ;of grain and provisions, so much is the public interested in knowing and in ascertaining the results from hour to hour of that business, that I cannot bring my mind to the conviction that this business, and these market quotations,—if they are the property of the board,—are not 'affected with a public interest,' whereby they cease to be private property only, within the principles so clearly and forcibly laid down in the Munn and Scott warehouse case. *Munn* v. *Illinois,* 94 U. S. 113.

"This market on the floor of the board of trade stands in 'the gateway of commerce.' The members on the floor of the board of trade take 'toll,' by way of commission, upon four-fifths of the wheat and other products of the great north-west—an empire in itself. These products—such is the course of trade—must, whether the owners desire it or not, pass through the board of trade market. A membership of the board, which confers the privilege of participating in the taking this 'toll,' is worth $10,000. It can make no difference in principle whether this 'toll' is taken by the corporation or by the members, the result to the public is the same.

"It may be true that neither the courts nor the legislature can interfere with its control of its own floor, or with the right of the board to discipline its members. But I am clearly of the opinion that the business transacted upon the floor of the board of trade is 'affected with a public interest' to an extent which would authorize the legislature, and the courts in the absence of legislation, to prohibit the board of trade exercising any discrimination as to who shall receive from the telegraph companies these market quotations, or as to what telegraph companies shall be allowed facilities for distributing the information to the public. It is opposed to the very spirit of its charter that it become a monopoly or a close corporation."

This is not denying to the board of trade the right to keep its transactions entirely secret from the public, if it choose to do so. Whether or not this may be done may be questionable; but it is not necessary to discuss the point, since the board desires, not secrecy, but discrimination. Nor is it even saying that the board may not make a just discrimination as to who shall be furnished with its prices. It is only unjust, unreasonable discrimination which is within the prohibition of the law. Just and reasonable discrimination is proper. A railway company must furnish transportation equally for all; but it may eject or refuse to carry one who persists in gambling on the train, just as it may put off or decline to take a man with the small-pox; and if it be clearly established that a business man or firm uses quotations furnished by the board for a gambling purpose exclusively, the board might justifiably and lawfully refuse to furnish him its prices, as was commendably decided in the principal case.

The criterion by which it is to be determined whether the transaction is gambling or not, is the intention of the parties. If they intend an actual *bona fide* sale and delivery it is a lawful transaction, and this although a settlement may be made finally by a payment of differences. But not so if they in fact intend merely to bet upon the turns of prices. Then the transaction is gambling, and as such all acts and contracts in furtherance of it are illegal.[1]

---

[1] That this is the law, see Cobb v. Prell, 15 Fed. Rep. 774; Melchert v. Am. U. Tel. Co. 11 Fed. Rep. 193; Bruce's Appeal, 55 Pa. St. 94; Smith v. Bouvier, 70 Pa. St. 325; Maxton v. Gheen, 75 Pa. St.

But in the light of an Indiana decision it may even be doubted whether the fact that the "ticker," or the information it conveyed, was to be used for gambling or other immoral purposes, would warrant the telegraph company in removing it. In *W. U. Tel. Co.* v. *Ferguson*[1] it was decide dthat the telegraph company could not refuse to transmit a message to "send me four girls" on the ground that the girls were intended for purposes of prostitution. "We know of no provision of law," said the court, "which would authorize the appellant, or any of its agents, to inquire into or impugn the motives of any one who might desire to transmit a message, couched in decent language, over the appellant's telegraphic lines; and certainly we are not aware of any law which makes the appellant or any of its employes, a censor of public or private morals, or a judge of the good or bad faith of any party who may seek to send a dispatch over the appellant's lines."

Another point may be suggested. A telegraph company is a public corporation, exercising public franchises,—*e. g.*, eminent domain,—and serving the public in all ways for which it is competent. It is an agent of the public. As a part of its business it collects, in the various cities and places to which its lines run, information of ruling market prices. This information it transmits over its lines, and sells it to such of the public as desire to buy it. Now, when the board of trade admits the reporters and operators of a public agent to its rooms, and allows them to take and transmit quotations of prices, does not the board make a publication of its prices to the public, which entitles the public to use them without restriction? Is not the giving of such prices to an agent of the public a publication of them for the benefit of the public? If it publishes its prices to the world, can it say that certain persons shall not avail themselves of them? The publication is not copyrighted. Can the board restrict the use of published quotations by the public any more than an author who has no copyright can, after publication, restrain the subsequent publication of his work by all who choose to print it?

Again, the telegraph company is a "public servant."[2] It is like a common carrier. As a public servant and as a common carrier, can it say that it will not carry for A. because B. does not desire it to do so? Can it avoid performance of its duties as a public servant by a contract with somebody not to perform them? The decisions appear to answer these questions negatively. In *State ex rel.* v. *Bell Telephone Co.*[3] it is decided that "a public servant cannot avoid the performance of any part of the duty it owes to the entire public by any contract obligation it may enter into, even with the patentee of an invention."[4]

Judge BLODGETT, of the United States circuit court, northern district of Illinois, holds views somewhat variant from the foregoing. "The material question, as it seems to me," says he, "is whether the board of trade is obliged to allow reporters of the telegraph company on the floor of its exchange for the purposes of collecting and transmitting reports of the market therefrom. Complainant insists that the public have a right to the information afforded by these market reports, and that because the two defendants are corporations, the board of trade is obliged to allow reporters on its floor, and the telegraph company is obliged to transmit such reports to whoever requires them, and is

166; Swartz's Appeal, 3 Brewst. 131; Fareira v. Gatell, 89 Pa. St. 89; North v. Phillips, 89 Pa. St. 25; Gheen v. Johnson, 90 Pa. St. 38; Ruchizky v. De Haven, 97 Pa. St. 202; Porter v. Viets, 1 Biss. 177; In re Green, 7 Biss. 338; Clark v. Foss, 7 Biss. 540; Rumsey v. Berry, 65 Me. 570; Noyes v. Spaulding, 27 Vt. 420; Sampson v. Shaw, 101 Mass. 145; Bigelow v. Benedict, 70 N. Y. 202; Story v. Solomon, 71 N. Y. 420; Harris v. Tunbridge, 83 N. Y. 95; Lyon v. Culbertson, 83 Ill.

33; Gregory v. Wendell, 39 Mich. 337; Barnard v. Backhaus, 52 Wis. 593; Sawyer v. Taggart, 14 Bush, 727; Wilheim v. Carr, 80 N. C. 294.
1 57 Ind. 495.
2 State ex. rel. v. Bell Telephone Co. 11 Cent. Law J. 350.
3 *Supra.*
4 See, also, New England Exp. Co. v. M. C. R. R. 57 Me. 188, 198; McDuffee v. Railroad 52 N. H. 455; Sandford v. R. R. Co. 24 Pa. St. 378.

willing to pay for them. The board of trade is a private corporation. It exercises no franchise which clothes it with any of the duties of a public corporation; it has no power of eminent domain, and no such duties are charged upon it toward the public as have heretofore been held by the courts to characterize or distinguish a public from a private corporation. It is only an association of merchants dealing in the products of the country, who, solely for their own convenience, provide a room where they meet to transact business. They have a right to exclude all other persons from the meetings of the board, or to admit only such as they choose. If out of compliment they give one person a ticket to their floors, it furnishes no reason why they should issue a similar ticket to another, any more than because one of its members invites a guest to dine at his house, the whole public have the same right to an invitation. As the proof shows, the board at great expense secures for the use of its own members reports of the market rates in other parts of the world. The claim of complainant, if allowed, would make these reports public property, and give the persons not members of the board, and who, perhaps, never could attain the position of membership of this body, all the advantages of membership; that is to say, if a person who has been expelled from this body for violation of its rules and regulations can thus compel the board of trade to allow the telegraph company to send to his office in this city or elsewhere reports of transactions on the board, he has all the benefits of a membership from which he has been excluded by perhaps his own misconduct. It is absurd to say that information thus obtained for private use becomes public property merely because it is collected and paid for through the agency of a private corporation. Transactions on the board are not public only so far as the board or its members see fit to make them so. Undoubtedly the members of the board who act as agents, brokers, or factors for others can be compelled by their principals to disclose prices to them, but not to the public. It is only those acting on the board for others—their principals—who can be required to make disclosures of their transactions, and then not to the public, but only to those for whom they are acting. Members of the board can go "on 'change" and deal with each other privately, and are not compelled to let the public know the prices at which they deal. The mere fact that they have been in the habit of informing the public of prices is no evidence that they are obliged to do so if they do not see fit to do it. In fact, we often see, as a matter of common knowledge and information, quotations made of large transactions between different dealers on the board in commodities, at prices not made public, thereby showing clearly that they exercise their own option of withholding from the public information as to their prices." [1]

These views are, in some respects, unsound. As previously pointed out, the duty of the board of trade, or any other person or company, in dealing with the public, cannot always be determined solely by reference to the *status* of the person or company as being private or public. It is true that duties to the public may result from the public character of the company or person, but it is equally true that such duties may be imposed upon a person or company that is private; witness the duty not to discriminate unjustly laid upon private companies, and even individuals, who are engaged in common carriage. It is the nature of the service, and the fact that it is rendered for the public, and not the political or legal *status* of the servant, that brings him or it within the rule of law prohibiting unjust discrimination, and it cannot be concluded that because "the board of trade is a private corporation," possessing no power of eminent domain, and exercising no public franchise, "that no such duties are charged upon it toward the public as have heretofore been

[1] Met. Gr. & St. Exchange **v.** Board of Trade, 15 Fed. Rep. 850.

held by the courts to characterize or distinguish a public from a private corporation." If the board of trade performs a service for the public, it must perform it in the manner directed by the public, no matter whether it is a private or a public corporation. In such a case the public or private quality of the company is immaterial.

Nor is the dissemination of its prices a matter of compliment indulged in by the board. It is a matter of business,—a service rendered to the public which is productive of ample profit to the board, accruing from the purchases and sales made by its members,—transactions to which the dissemination of its prices is highly essential.

Further, it is not true that to allow an expelled member of the board to receive quotations by telegraph is to give him "all the benefits of a membership from which he has been excluded by, perhaps, his own misconduct." He is still deprived of his right to buy and sell in the markets of the board from which he is excluded; a privilege worth many times more than the information as to the ruling prices is worth.

The better view appears to be that the board of trade may keep its proceedings entirely secret, if it chooses; but if it undertakes to make them public it must serve all alike, and impartially, in giving information of them.

Can a telegraph company lawfully refuse to furnish a person with an instrument known as a "ticker," by means of which these quotations are disseminated?

The custom of the board of trade has been to allow reporters and operators of the telegraph companies upon the floor of its business apartments during business hours, in order that they may ascertain the ruling prices and telegraph them wherever the telegraph reaches. If the telegraph company and its reporters and operators be considered in the light of agents of the board, their duty as to distributing this information is undoubtedly the same as the duty imposed by the law upon their principal. They cannot discriminate unjustly any more than the board itself. But if the telegraph company and its employes be considered apart from the board, an interesting question presents itself.

Is it the duty of a telegraph company to collect and transmit information? On this point Judge BLODGETT says: "The further reason which was urged in behalf of the telegraph company, that it is no part of the duty of the telegraph company to transmit information, seems to be cogent and forcible. If they volunteer to follow that class of employment, they are bound, perhaps, to do it with fidelity while their contract continues; but whenever they terminate their contract, no person can compel them to enter into another, or to continue it when they wish it terminated." [1] And Judge MAXWELL, in *Bradley* v. *W. U. T. Co.*,[2] says: "It appears that the defendant has been engaged in collecting these quotations and furnishing them to parties carrying on business in different places, at a stipulated price. These quotations are known in the trade as commercial news. This business of collecting and furnishing commercial news is separate and distinct from the business of the defendant as a common carrier. The defendant, as a common carrier, can properly only receive messages from one person to be transmitted over its wires to another; and, acting as a bailee in collecting this commercial news and furnishing it to customers, it is in the same position as a private person would be who buys and sells goods. One is tangible and the other intangible, but there is no difference in principle. This business being in its nature private and not public, the defendant could furnish commercial news to any person it pleased, and withhold it from any person it pleased, and is not under any such obligation as it is in its relations to the public as a carrier of messages for hire. That being so, and this contract not

[1] Met. Gr., etc., v. Board of Trade, 15 Fed. Rep. 850.      [2] Cincinnati Com. Gaz., April 8, 1883.

having been made for any definite length of time, the court cannot compel the defendant to continue furnishing the news to the plaintiff. If the plaintiff has been injured, he has an adequate remedy in an action at law for his damages."

It may be true that it is not the duty of a telegraph company to collect information—to become a public collector of news; and it may also be true that it is their privilege to withdraw entirely from such a business. But it is not withdrawing from the business to refuse to furnish one person with information collected for and furnished to all others of the public who desire it. This is discrimination in business, not retirement from it; and if the telegraph company undertake that duty at all, it is difficult to see why it should not perform it in the manner prescribed by law; and admitting that the telegraph company stands in the position of a private person who buys and sells goods, it may be questioned, in the light of the well-known Granger decisions,[1] whether it would have a right to discriminate, without reason or justice, as to the person to whom it will sell the information it collects. Can a person engaged in seling goods to the public so discriminate? Suppose there was but one depot of supplies of fuel within reach of a community; that it was owned by a store-keeper, who, while holding himself out ready to serve all who might apply for goods, should, because of some personal dislike, refuse to sell supplies to A. Would A. be compelled to remain without fuel, although ready to buy and pay for it, and although all of his neighbors were sold to without objection?

These questions may seem almost absurd to one accustomed to regard property subject absolutely to the control of the owner. But with modern capital and facilities for combination, many staples are passing into the control of men who, as corporate bodies, deal with the public as a single individual. For example, the entire oil product is monopolized by the Standard Oil Company. The manufacture of tacks is entirely controlled by the Central Tack Company. Wall paper is also monopolized by a pool. There is hardly a branch of business but has its monopoly, of whom the public must buy or go without supplies. It can hardly be admitted that the common law is so deficient in principle as to leave the public without remedy in case of a refusal of these monopolies to supply it, without unjust discrimination and upon reasonable terms. The business of telegraphing, and all its incidents, is also in the hands of a monopoly. In dealing with the public it must obey the same rules as are applied to railway companies and other public servants.

It may be conceded that telegraph companies are not strictly common carriers because they do not have tangible possession of goods to be carried.[2] But their employment is of a public nature, and they are bound by the same rules applicable to other public servants, including common carriers.

Finally, may be noted the case of *State ex rel.* v. *Bell Telephone Co.*[3] There one of the defendants, a telegraph company, refused to supply complainant, another telegraph company, with a telephone, having agreed with the patentee and licensor (also a defendant) thereof not to lease the instruments to other telegraph companies.

It was decided that, notwithstanding this agreement with the patentee, and notwithstanding his monopoly of the invention patented, it having been leased by him for public purposes to a telegraph company, that company must furnish instruments for the use of whoever desired them, it being a public servant, and, as such, possessing no right to discriminate unreasonably as to whom it would provide with its instruments. This appears to be the correct view.

*Chicago.* ADELBERT HAMILTON.

[1] Munn v. Illinois, 94 U. S. 113 *et seq.*

[2] Baldwin v. U. S. Tel. Co. 1 Lans. 137; 54 Barb. 505; 6 Abb. Pr. (N. S.) 405; Leonard v. N. Y., etc., Tel. Co. 41 N. Y. 544; Aiken v. Telegraph Co. 5 S. C. 358; Grennell v. W. U. Tel. Co. 113 Mass. 299; Breese v. U. S. Tel. Co. 48 N. Y. 132.

[3] 36 Ohio St. 480